UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KYLE A. AVERKAMP, | |
| Plaintiff, | No. 17 C 8491 |
| v. | Judge Thomas M. Durkin |
| C/O SAMUEL DIXON; C/O STUART KESSLER; C/O TYLER SOBIN; DEBRA MCCALLUM, R.N.; ROBIN ROSE; AND DR. ROZEL ELAZEGUI, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Kyle Averkamp sued Dr. Rozel Elazegui, the former medical director at Sheridan Correction Center, under 42 U.S.C. § 1983, alleging a violation of his Eighth Amendment rights. Averkamp's claim stems from the medical care he received while incarcerated at Sheridan. Now before the Court is Elazegui's motion for summary judgment, R. 106. That motion is granted.

**Background**

The following facts are undisputed except where otherwise indicated. On November 6, 2016, Averkamp was physically attacked while incarcerated at Sheridan. He was first taken to Valley West Community Hospital and transferred to the OSF Healthcare St. Anthony Center emergency room. DSOF ¶ 8.[1] Averkamp was

---

[1] References to Elazegui's Rule 56 statement of facts will be cited as "DSOF." References to Averkamp's statement of facts will be cited as "PSOF." References to Averkamp's responses to Elazegui's statement of facts will be cited as "PR."

seen by Dr. Emily Wilczak in the OSF trauma department. *Id.* at ¶ 9. Imaging showed multiple right-sided facial fractures, and Dr. Wilczak requested a consult with a plastic surgeon. *Id.* The next day, Averkamp was seen by Dr. Sarah Hagarty, a plastic surgeon. *Id.* at ¶ 10. Hagarty reviewed Averkamp's scans and determined the fractures warranted surgery. *Id.* Averkamp was discharged on November 7, 2016 pending surgery to allow his swelling to reduce. *Id.* Upon discharge, he received a recommendation for Tramadol, a Schedule IV narcotic in a category of drugs known as opioid analgesics. *Id.* at ¶ 12.

Hagarty performed the surgery on Averkamp on November 17, 2016. DSOF ¶ 18. The surgery went well, and Averkamp was discharged the next day. *Id.* Upon discharge, he was prescribed ten pills of hydrocodone-acetaminophen to be taken every six hours as needed. *Id.* Hydrocodone-acetaminophen is commonly known as Norco. It belongs to the same group of drugs as Tramadol—opioid analgesics. Hagarty testified during her deposition that she normally prescribes either Norco or Tramadol for the type of surgery Averkamp had, noting, as to the drugs' comparable effects on pain, they are "about the same level." *Id.* at ¶ 20.

Elazegui first saw Averkamp on November 19, 2016. *Id.* at ¶ 22. Rather than prescribing Norco, Elazegui prescribed Tramadol and Tylenol to be taken three times per day for ten days. *Id.* The parties agree the Tramadol dose prescribed by Elazegui—100 mg—is the maximum allowable dose. *Id.* at ¶ 23. The parties also

---

References to Elazegui's responses to Averkamp's statement of facts will be cited as "DR."

agree the combination of Tramadol and Tylenol has the same pain control effects as Hydrocodone and Acetaminophen (Norco), as both combine an opioid and acetaminophen. *Id*. at ¶ 24.

On November 23, 2016, Averkamp had a follow-up appointment with Hagarty and was seen by Elazegui upon returning to Sheridan. He complained of blurry vision, and Elazegui requested an urgent evaluation from an ophthalmologist. *Id*. at ¶ 27. Elazegui performed a physical examination, noting minimal swelling around the incision and normal pupil reaction and movement. *Id*. Elazegui determined Averkamp should continue with his medications as prescribed.

Elazegui next saw Averkamp on November 27, 2016. *Id*. at ¶ 30. Averkamp complained of lightheadedness and vomiting. Elazegui examined him and saw no current signs of dizziness or distress and continued with the Tramadol and Tylenol. *Id*. On November 30, 2016, Averkamp reported that his dizziness and nausea was improving. *Id*. at ¶ 31. Still, Elazegui ordered that Averkamp see an optometrist. *Id*.

On December 4, 2016, Averkamp reported he had a migraine the day before. *Id*. at ¶ 35. Elazegui performed a detailed physical and neurological examination which yielded normal results. *Id*. Averkamp does not dispute that, at this point, Elazegui did not believe Averkamp was experiencing symptoms of a concussion. *Id*.

On December 8, 2016, Averkamp was seen by Hagarty at OSF Plastic Surgery clinic. She recommended a three-month follow up appointment and a follow-up with a trauma specialist to manage any possible concussive symptoms. *Id*. at ¶ 36. Averkamp objects to this statement of fact, denying "that Defendant has cited any

3

admissible evidence to support the propositions" in it. PR ¶ 36. But this is essentially the basis of Averkamp's argument—that Hagarty recommended he be seen by a trauma specialist. Indeed, he relies on this recommendation throughout his entire response. It appears, even though he made a vague objection, that it is undisputed that Hagarty recommended an appointment with a trauma specialist.

On December 9, 2016, Dr. Obaisi, another doctor at the prison, requested a referral to a trauma specialist, based on Hagarty's recommendation. DSOF ¶ 39. The appointment was scheduled for January 10, 2017. *Id.* In the meantime, Elazegui saw Averkamp five more times. On December 11, Averkamp told Elazegui his nausea and vomiting had resolved, and informed him of his history of migraines which predated his injuries. *Id.* at ¶ 40. Elazegui ordered Averkamp to continue with the Tramadol and Tylenol. *Id.* On December 14, 2016, Averkamp complained of headaches and occasional dizziness. *Id.* at ¶ 41. Elazegui performed various neurological exams, all of which were normal. *Id.* The nausea and vomiting had apparently resolved by December 21, 2016, when Elazegui saw Averkamp again. *Id.* at ¶ 43. It was at this appointment that Elazegui diagnosed Averkamp's headaches as post-concussive headaches, and prescribed Amitriptyline, an antidepressant used to treat post-concussive headaches. *Id.* Elazegui saw Averkamp again on December 28, 2016, and January 8, 2017. At the January 8 appointment, Elazegui noted that Averkamp had an upcoming appointment with the trauma specialist. *Id.* ¶ 45.

On January 10, 2017, the date Averkamp was scheduled to see the trauma specialist, during a phone call between Sheridan Healthcare Unit Administrator

4

Robin Rose and OSF Nurse Patricia Smith, the appointment was cancelled. *Id.* at ¶¶ 46, 47.[2]

On January 15, 2017, Averkamp reported that his headaches had been improving. *Id.* at ¶ 49. Elazegui ordered an x-ray of Averkamp's jaw to make sure none of the surgical implants had been displaced, and continued the Tramadol (at a lower dosage) for another seven days. *Id.* Elazegui then saw Averkamp again on January 22 (headaches continued to decrease, current pain management was continued) and January 25 (headaches returned, Elazegui ordered the Amitriptyline to be resumed "ASAP"). *Id.* at ¶¶ 50-51. On March 9, Averkamp requested a refill of Imitrex, a migraine medication prescribed by Obaisi. Dr. Elazegui refilled the prescription. *Id.* at ¶ 53.

The headaches continued, and whenever Averkamp complained of them, Elazegui adjusted the prescribed medications in attempts to address the issue. *See id.* at ¶ 54 (prescribing migraine medication Propranolol for three weeks on April 17);

---

[2] Averkamp objects to consideration of any information from Robin Rose's affidavit because it does not contain the words "under penalty of perjury." R. 107-5; R. 110 at 8. Elazegui argues the Rose declaration is admissible because it was provided under oath, but nonetheless submitted an amended Rose declaration, signed and dated in October 2021, which is identical to her previous declaration but now includes the language "under penalty of perjury." This is acceptable. *See Trapaga v. Central States Joint Bd. Local 10*, 2007 WL 1017855, at *6 (noting the plaintiff could have rendered its submitted affidavits admissible by re-filing amended versions with the appropriate language regarding penalty of perjury). *See also Hernandez v. Helm*, 2019 WL 5922233, n.6 (N.D. Ill. Nov. 12, 2019) (considering affidavits at summary judgment even without the required perjury language). And indeed, Averkamp responded to the substance of the Rose declaration in his response. R. 110 at 8-9. For reasons explained *infra* at n.4, however, the parts of the Rose declaration which rely on hearsay were not considered by the Court in deciding the instant motion.

¶ 55 (prescribing migraine medication Inderal LA for two weeks on May 18); ¶ 56 (changing the Inderal LA prescription to Inderal IR, an equivalent migraine medication, when he learned Inderal LA was not available on May 19); ¶ 57 (prescribing Excedrin for two weeks on May 26). May 26, 2017 was Averkamp's last appointment with Elazegui.

Upon his release from IDOC, Averkamp sought treatment from a family practice physician at Northern Illinois Medical Center who referred him to a neurologist. PSOF ¶ 24. The neurologist examined Averkamp in February and March 2019, ordered a CT scan, and prescribed Pamelor, an antidepressant and nerve-pain medication, which Averkamp says mitigated his pain. *Id.*

Averkamp brought this action in 2017. In his second amended complaint, filed on January 8, 2021 with the assistance of counsel, he alleged three counts. Count II is the only remaining count, alleging Elazegui was deliberately indifferent to his serious medical needs when he failed to administer proper pain medication and denied appropriate proper post-operative care. R. 80 at 9.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d

6

887, 894 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horston v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248.

### Analysis

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim has both objective and subjective components. *Id.* at 653. "To satisfy the objective component, a prisoner must demonstrate that his medical condition is 'objectively, sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective component requires proof that the defendant knew of and disregarded an "excessive risk to inmate health." *Id.*

### I. Serious Medical Need

It is undisputed that the attack leading to Averkamp's surgery caused serious harm and warranted urgent medical attention. Elazegui does not make any argument

7

that Averkamp's condition was not serious during the relevant time period following the attack. The Court assumes then, for the sake of this motion, that a jury could reasonably find that Averkamp's post-surgery migraines, other headaches, nausea, and occasional blurry vision constituted an objectively serious medical need. *See Gutierrez v. Peters*, 111 F.3d 1364, 1370 (7th Cir. 1997) (citing *Estelle*, 429 U.S. at 107) (explaining that the "serious medical need" standard encompasses "medical conditions far less critical than 'life-threatening.'").

## II. Sufficiency of Treatment

The remaining question is whether a jury could reasonably find that Elazegui's response to Averkamp's medical condition constituted deliberate indifference. The deliberate indifference standard is akin to the criminal recklessness standard. *See Farmer*, 511 U.S. at 839-840. Mere negligence will not support liability under an Eighth Amendment claim. *See Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Rather, a prisoner's medical treatment violates the Eighth Amendment only where it is "blatantly inappropriate." *Greeno*, 414 F.3d at 654. This can be established through evidence that the prisoner was "literally ignored" or that the treatment was such that "no minimally competent professional would have so responded under those circumstances. *Johnson v. Obaisi*, 2020 WL 433872, at *6 (N.D. Ill. Jan. 28, 2020) (citing *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) and *Pyles v. Fahim*, 711 F.3d 403, 409 (7th Cir. 2014)). Accordingly, a plaintiff must show more than simple medical malpractice. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). A disagreement between a prisoner and his doctor, or even between two

medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish deliberate indifference. *Greeno*, 414 F.3d at 653.

In addition to the high standard for a deliberate indifference claim, the defendant must be "personally responsible" for an Eighth Amendment violation. *See Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017). Section 1983 liability cannot be premised on a theory of respondeat superior. *Kinslow v. Pullara*, 538 F.3d 687 (7th Cir. 2008). Thus, Elazegui cannot be held liable for any alleged mistreatment purely by virtue of being Sheridan's medical director. He must have actively participated in the complained-of conduct, or at the very least facilitated, approved, condoned, or willingly turned a blind eye to it. *Rasho*, 856 F.3d at 478.

A. <u>Appointment with a Trauma Specialist</u>

Averkamp argues Elazegui's failure to schedule a follow-up appointment with a trauma specialist constitutes deliberate indifference. The parties do not dispute that Elazegui did not personally cancel the trauma specialist appointment.[3] Averkamp argues the personal involvement requirement is still met because Elazegui did not reschedule the appointment. But Elazegui, at the time the trauma

---

[3] Parts of the Rose declaration, in which Rose provides context for the appointment's cancellation, go into detail as to the substance of the phone call with nurse Smith. These portions of the declaration are based on hearsay and thus the Court may not consider them. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). The parties seem to agree, however, that it was not Elazegui who either made or cancelled the appointment, and even without the inadmissible portions of the declaration, that fact is established in Elazegui's testimony as well as the prison medical records showing Obaisi made the appointment. DSOF ¶61 (referencing R. 107-10; DSOF ¶ 39). Averkamp makes no argument to the contrary and focuses instead on the failure to reschedule.

9

appointment was cancelled, had personally met with Averkamp at least six times, and was entitled to rely on his own medical judgment as to what treatment was necessary.

Elazegui made the determination that he could manage Averkamp's post-concussive symptoms on his own as a general practitioner. R. 118 at 8. It was within his medical discretion to do so. He testified as to his reasoning for not making a second referral to a trauma specialist—he conducted multiple objective tests and found the physical and neurological results to be normal. *Id.* at 11. Averkamp argues he should have received an MRI or CT scan, but those are "simply diagnostic tool[s], and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 409 (quoting *Estelle*, 429 U.S. at 107)). *See also Dean v. Wexford Health Sources, Inc.*, 2021 WL 5230855, at * 63 (N.D. Ill. Nov. 10, 2021) ("Nowhere in the cited testimony did [the defendant] testify that he consciously opted against what he knew was the best treatment. [The plaintiff] cannot establish deliberate indifference simply by citing to things [the defendant] did not do.").

In total, Elazegui did not make the initial referral for a trauma specialist—Dr. Obaisi did. He did not cancel the appointment. Exercising his medical discretion, he promptly conducted a thorough examination and recorded the basis for his determination that a new referral to a trauma specialist was not necessary. Averkamp has not provided any fact showing (or even alleging) that the failure to follow-up with a trauma specialist caused him harm. In fact, he testified that he did not know if any doctor said Elazegui's course of treatment caused harm. DSOF ¶ 80.

He did not submit evidence from which a jury could reasonably find that Elazegui's exercise of medical judgment departed significantly from accepted professional norms. *See Roe*, 561 F.3d at 857-58. Indeed, Averkamp received a CT scan from the neurologist he saw upon his release from Sheridan, but he provides no argument that the CT scan found something that Elazegui missed because he failed to provide one. The record clearly supports a finding that Elazegui's course of treatment in opting not to make a trauma referral was not blatantly inappropriate. *Greeno*, 414 F.3d at 654.

B.  Choice of Medication

Averkamp also takes issue with Elazegui's choice of medication in treating Averkamp and his decision not to prescribe Norco, as Hagarty recommended. But Elazegui's choice of medication does not constitute deliberate indifference. Averkamp's complaint is that he received Tramadol instead of Norco. He does not dispute the fact that Hagarty—who he spends significant time arguing is the specialist who should have been relied on—testified that she essentially uses Tramadol and Norco interchangeably. DSOF ¶ 58. This alone is fatal to Averkamp's claim, as Hagarty's testimony confirms that Elazegui's course of treatment was within the medical standard of care, and thus a reasonable jury could not find that "no minimally competent professional" would have prescribed Tramadol and Tylenol rather than Norco. *See Johnson*, 2020 WL 433872 at *6.

Moreover, every time that Averkamp complained that his medications were not helping, Elazegui responded by changing the medications—he did this at least

11

four times in six months. DSOF ¶¶ 54-57. There is no deliberate indifference where a provider prescribes new medications or changes the doses of existing medications to respond to an inmate's pain complaints. *Pyles*, 771 F.3d at 412. Averkamp does not suggest what medication should have been given to him, and although the neurologist he saw after his release prescribed Pamelor, he has not provided any evidence that any doctor said Pamelor was the medication which should have been given in the first place. The only doctors the parties rely on instead say the medication he was given (Tramadol) was equivalent to the one Hagarty initially suggested. When that didn't help, Elazegui continued to try alternative options in an effort to help Averkamp. And the medications did help him on numerous occasions, when he reported lessening headaches and resolved blurry vision. *See, e.g.*, DSOF ¶ 49 (reporting improved headaches). The fact that Elazegui did not "cure" Averkamp of his post-surgical pain is not deliberate indifference. *See Snipes v. Deltella*, 95 F.3d 586, 591 (7th Cir. 1992) ("To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd.").

In summary, assuming the evidence is sufficient to show that Averkamp was suffering from a serious medical need during the recovery from his assault, no reasonable jury could find that Elazegui was deliberately indifferent to it. There is no evidence that he ignored an excessive risk to Averkamp's health—the record makes clear he exercised his medical discretion and provided attentive, thorough care to

12

Averkamp during his incarceration. Elazegui is therefore entitled to summary judgment.[4]

## Conclusion

For the foregoing reasons, Dr. Elazegui's motion for summary judgment, R. 106, is granted. The Court thanks plaintiff's counsel for excellent advocacy on behalf of Mr. Averkamp.

ENTERED:

*Thomas M Durkin*

Dated: April 11, 2022

Honorable Thomas M. Durkin
United States District Judge

---

[4] Because Averkamp's claim fails as a matter of law, the Court need not consider the parties' arguments regarding punitive damages.

13